Frank L. TORRIES, et al.,

v.

Sid HEBERT, et al.

No. CIV.A. 6:00–512.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

Aug. 28, 2000.

E. Barton Conradi, Baton Rouge, LA, for plaintiff, Frank Lee Torries.

Marjorie R. Esman, New Orleans, LA, for plaintiff, Tricia Romero Boudoin.

Stephen J. Oats, Oats & Hudson, Lafayette, for defendants, Sid Hebert, defendant, District Attorney of Iberia Parish.

## MEMORANDUM RULING

MELANCON, District Judge.

Before the Court is plaintiffs' application for a preliminary injunction. The Court's analysis of plaintiffs' application begins with a recognition that "all—political and non-political—musical expression, like other forms of entertainment, is a matter of [F]irst [A]mendment concern";[1] that "[m]usic, as a form of expression and communication, is protected under the First Amendment";[2] that the "First Amendment protection extends to rap music";[3] and that the First Amendment protection is not weakened because the music takes on an unpopular or even dangerous viewpoint:

> The constitutional protection accorded to the freedom of speech and of the press is not based on the naive belief that speech can do no harm but on the confidence that the benefits society reaps from the free flow and exchange of ideas outweigh the cost society endures by

1. *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 569 (9th Cir.1984).

2. *Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

3. *Davidson v. Time Warner, Inc.,* 1997 WL 405907, 15 (S.D.Tex. 1997); *Betts v. McCaughtry,* 827 F.Supp. 1400, 1406 (W.D.Wis.1993)

receiving reprehensible or dangerous ideas.[4]

At the onset, it should be noted that the Court finds some of the music which it has been exposed to through this litigation to be both disgusting and offensive and if the Court were charged with the care, custody and control of minor children, it would not allow those minors to listen to or frequent places where such music was played. However, under the Constitution which established the Republic in which we live, it is not the musical likes or dislikes of this United States District Judge, nor the individual musical tastes of the Sheriff of Iberia Parish, that can or should be allowed to establish the boundaries of the First Amendment.

The Court is ever mindful that the "First Amendment became a part of the Constitution because the Crown sought to suppress the Framers' own rebellious, sometimes violent views;"[5] that it is the cornerstone upon which the Republic rests; and that it is the first and strongest defense against government tyranny that the Framers so greatly feared. The First Amendment protects all of us, including the plaintiffs in this case, from over zealous government agents be they federal, state or local, even those government agents who are, or who profess to be well intentioned.

For the reasons that follow, the Court will grant plaintiffs' requests for injunctive relief against Sheriff Sid Hebert and Commander Kerry Davis. The Court will also grant plaintiff's demand for a declaratory judgment against Phil Haney in his official capacity as the District Attorney of the Sixteenth Judicial District for the State of Louisiana.

## I. Background

Plaintiffs, Frank Torries, Tricia Boudoin and House of Wheels of New Iberia, Inc.

d/b/a Skate Zone, instituted this suit asserting damages under 42 U.S.C. § 1983 for violations of their First Amendment rights, violations of their rights pursuant to the Louisiana Constitution and seeking injunctive relief as a result of the defendants' actions in seizing compact discs from the Skate Zone and arresting and prosecuting Torries and Boudoin for violations of La. R.S.14:92 and 14:91.11.

Torries is the owner of the Skate Zone, a skating rink located in New Iberia, Louisiana. According to Torries, he regularly hosted dance parties on Saturday nights at the Skate Zone. Boudoin, an employee of the Skate Zone, was working there on the night of February 5, 2000. According to the various witnesses who testified on behalf of the parties, there were approximately three hundred youths attending the Skate Zone that night. The youths in attendance ranged from ages seven to sixteen. Of the three hundred youths in attendance, thirty to fifty were from Franklin, Louisiana, a community located in neighboring St. Mary Parish. The fact that the Franklin group was in attendance on the night of February 5 has particular relevance to this action. Several of the witnesses who testified at the hearing on plaintiffs' application for preliminary injunction stated that a rivalry exists between the youth of Iberia and St. Mary Parishes. The Franklin group had arrived at the Skate Zone by way of a St. Mary Parish school bus driven by Ernest Sikes.

At some point during the evening of February 5, the skating activities at the Skate Zone terminated and a dancing session began. Although the exact sequence of events is not entirely clear from the testimony of the witnesses present at the Skate Zone, a certain type of music which has been referred to as "gangster rap" was played to begin the dancing session.[6] Ac-

---

4. *Herceg v. Hustler Magazine, Inc.,* 814 F.2d 1017, 1019 (5th Cir.1987).

5. *Davidson v. Time Warner, Inc.,* 1997 WL 405907 (S.D.Tex. 1997).

6. Although this Court does not hold itself as a music industry expert and most of what it knows on the subject was gleaned from the testimony of the witnesses at the hearing on plaintiffs' application, it appears that there

cording to Sikes, the playing of this music immediately caused the children to become aggressive and confrontational. Sikes indicated that he witnessed some of the youths display physical signs which he associated with gang membership. In an apparent effort to avoid any friction between the Franklin youths he transported to the Skate Zone and the other attendees, Sikes had the disc jockey interrupt the music to announce that his bus would be leaving in two to three minutes and anyone who was not on the bus would be left. Whether caused by this announcement, the alleged group rivalry, the music, or another incident that may have occurred on the evening of February 5, some of the youths who were still in possession of their skates threw them into the air while other youths apparently became involved in physical altercations of some sort. Boudoin, sensing that what she was witnessing could lead to a situation which could not be controlled by the three Hub City Security officers who were on duty and who had been hired to assist the management of the Skate Zone with security, placed a call to the Iberia Sheriff's department requesting assistance. While officers of the Iberia Sheriff's department were in route to respond to Boudoin's call, according to Sikes, he attempted to board all of his passengers in order that he could leave the Skate Zone premises. During Sikes' attempt to leave, several of the windows in the bus were damaged, resulting in damage totaling $150.00 to $200.00.

Shortly thereafter, officers of the Iberia Sheriff's department arrived at the scene. After the situation in the parking lot was brought under control, defendant Kerry Davis, a commander with the Iberia Sheriff's department, ordered Corporal Gerald Hebert to go inside the Skate Zone to interview the Hub City Security personnel to determine what had transpired. Davis also instructed Corporal Hebert to question the security personnel regarding the type of music played that night.

Upon interrogating the Hub City Security officers, Corporal Hebert determined that "gangster rap" music was being played at approximately the same time the violence erupted. According to Corporal Hebert, the Hub City officers told him that the music being played was so loud that they couldn't understand the words but at least one of the officers told Hebert the music *implied* violence. Corporal Hebert reported his findings to Davis. Davis then instructed Corporal Hebert to find Boudoin and ask her to identify what music had been played that night. Upon questioning Boudoin regarding the music and relaying his findings to Davis, Davis ordered the seizure of all of the compact discs from the box in the disc jockey booth from which Boudoin indicated the music actually played that night were stored. According to Davis, the seizure of the compact discs was prompted by reports that music being played at the Skate Zone contained explicit language which promoted violence and incited the teenagers at the Skate Zone to become entangled in fights.

Corporal Hebert proceeded to seize all of the compact discs from the box that Boudoin had previously identified. Although Corporal Hebert did not indicate what the compact discs were evidence of, he did inform Boudoin that the compact discs were "evidence." According to Boudoin, Corporal Hebert also told her that the music was "suggestive" and that "it

---

are at least three variations of what is referred to as "rap" music. The first is traditional "rap" which encompasses primarily lyrical rhyming with a secondary emphasis on a musical background. The second variation is "hip-hop" which focuses primarily on the musical component of songs which are upbeat and have a high tempo and rhythm. The third variation, which is the subject of the music at issue in the case at bar, is "gangster rap." This form of rap music combines the high tempo music of "hip-hop" with the lyrical rhyming of rap and appears to focus on themes which may be associated with gang cultures and might include the use of profanity, depictions of violence, and/or anti-law enforcement messages.

would have looked better for you if you were not playing rap."

Immediately after Corporal Hebert's seizure of the compact discs, Boudoin telephoned Torries who was out of town in order to inform him of the events that had transpired. Upon Torries' request, Torries spoke to Davis on the telephone at which time Torries allegedly threatened to institute civil proceedings against Davis if he seized the compact discs at issue. Boudoin maintains that Davis informed Boudoin, Torries or both that the Skate Zone was not to reopen until Torries spoke to Sheriff Hebert.

Since skating sessions at the Skate Zone are centered around music, Boudoin approached Davis sometime during the following week to reclaim the previously seized compact discs. Boudoin contends that after refusing to return the compact discs, Davis told her, "if you open, you will go to jail."

Shortly thereafter, a representative of Sheriff Hebert's office contacted Torries in order to schedule a meeting with Hebert, Torries and Boudoin. Torries, accompanied by Boudoin, went to the Iberia Parish Sheriff's department and upon their arrival, were informed they were being placed under arrest for contributing to the delinquency of a juvenile in violation of La. R.S. 14:92. Torries and Boudoin contend that Sheriff Hebert informed them that they were being placed under arrest because of the music they played at the Skate Zone. Torries and Boudoin also allege that Sheriff Hebert held up three compact discs and told them he had enough to arrest them with the discs.[7]

Torries and Boudoin were subsequently arrested and booked into the parish prison. After their arrest, Torries and Boudoin maintain that Sheriff Hebert threatened to arrest them again if they continued to play the same type of music previously seized from the Skate Zone. Sheriff Hebert's alleged threats are corroborated in part by a letter Hebert submitted to the clergy in Iberia Parish which provided in part:

## I BELIEVE THE TIME HAS COME FOR U.S. TO RAISE THE BANNER!!

The standard of our community is slowly eroding and this is evidenced by an incident which occurred this weekend. If you read the Saturday newspaper, you noticed that we had to arrest the owner and manager of the Skate Zone here in Iberia Parish. It's a shame but we had to charge them with contributing to the delinquency of minors. The music that is being played in this establishment is not what we in the this community want our minor children to be hearing. This music is demeaning toward women, includes [sic] radical[8] slurs, strong vulgar language and lyrics with anti-law messages. We also have to respond to calls of fights at this establishment very often.

As I said before, I believe it is time to take a stand and let the people know that we will not tolerate this type of corruption involving our children. The lyrics of these songs breed violence in the minds of our children, then unfortunately, they act out what was planted in their minds. Pastors, please let our congregations know what is going on in their community. I am asking you to please take a stand with me on this. I believe I know the heart of the parish and that is why I made the decision to make this a legal matter. Please keep in touch with me and I will keep you informed on this matter so that you may keep your congregations' informed.

Despite Torries' protestations over the seizure of his compact discs, defendants

---

7. The compact discs which Sheriff Hebert allegedly displayed were by the artists "Master P" and "Juvenile."

8. According to Sheriff Hebert's testimony, he intended "racial" as opposed to "radical" slurs.

continue to retain several of the compact discs in their possession. According to Torries, he has suspended the Saturday night dance sessions at the Skate Zone at least in part out of an alleged fear of retaliation from the defendants. In an effort to reclaim the seized discs and to protect against future arrests, plaintiffs submitted the instant application for preliminary injunction, requesting that defendants be enjoined as follows:

1. Requiring the return to the owners and operators of the Skate Zone all property seized from the Skate Zone premises on February 5, 2000 by the Iberia Parish Sheriff's Department.

2. Preventing subsequent searches of the Skate Zone premises by representatives of the defendants without an order authorizing the search signed by a judicial officer

3. Preventing the re-arrest of the plaintiffs and Skate Zone employees or representatives for playing any recording seized as described in number 1 above *or* any other music recording which has been the subject of a prior judicial determination as constitutionally protected.

4. Preventing the defendants or their representatives from imposing or inflicting any punishment, retaliation, harassment, or sanction of any kind against the plaintiffs for the exercise of their constitutional rights.

After applying for their original request for a preliminary injunction, plaintiffs amended their application to add the District Attorney for the Sixteenth Judicial District of the State of Louisiana, Phil Haney, as a defendant in his official capacity. As related to the District Attorney, plaintiffs seek to enjoin the prosecution of plaintiffs for the crimes which are alleged to have arisen out of the February 5, 2000 incidents. In addition to the original charges filed against plaintiffs, the District Attorney on July 21, 2000, the day after the first hearing on plaintiffs' application for preliminary injunction was held, filed amended bills of information against plaintiffs to include violations of La. R.S. 14:91.11 which prohibits the sale, exhibition, or distribution of material harmful to minors.

## II. Standard for Injunctive Relief.

A preliminary injunction pursuant to Fed.R.Civ.P. 65 is a provisional remedy issued prior to final judgment. It is intended to preserve the status quo and prevent irreparable loss of rights prior to judgment. *Compact Van Equip. Co. v. Leggett & Platt, Inc.,* 566 F.2d 952, 953 (5th Cir.1978). To obtain a preliminary injunction, a plaintiff must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury absent the injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest. *Enrique Bernat F., S.A. v. Guadalajara, Inc.,* 210 F.3d 439, 442 (5th Cir.2000).

If a plaintiff makes a strong showing as to the other factors, "some likelihood" of success may be all that is necessary to satisfy the first element required for issuance of a preliminary injunction. *Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir.1980). An irreparable injury is an injury which cannot be redressed by a legal or equitable remedy following trial. The preliminary injunction must be the only way of protecting the plaintiff from such harm. *Campbell Soup Co. v. ConAgra Inc.,* 977 F.2d 86, 91 (3rd Cir.1992). If adequate compensatory damages will ultimately be available in the ordinary course of litigation, the existence of an irreparable injury is severely compromised. *F.D.I.C. v. Faulkner,* 991 F.2d 262, 265 (5th Cir.1993). In the balancing of the hardships inquiry, the court must identify the harm which a preliminary injunction might cause the defendant and weigh it against the plaintiff's threatened injury. *Allied Marketing Group, Inc. v.*

CDL Marketing, Inc., 878 F.2d 806, 809 (5th Cir.1989). When the harm to the defendant that may be caused by the injunction is equal to or greater than the injury threatened, it is improper to grant the injunction. *Apple Barrel Productions, Inc. v. R.D. Beard,* 730 F.2d 384, 389 (5th Cir.1984). Lastly, the moving party must show that issuance of the injunction will not disserve the public interest. *Cherokee Pump & Equip., Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994).

### III.   Analysis

#### A.   Anti–Injunction Act: 28 U.S.C. § 2283

■ The Anti–Injunction Act generally prohibits federal courts from interfering with proceedings in state courts:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

"The Act, which has existed in some form since 1793, *see* Act of Mar. 2, 1793, ch. 22, § 5, 1 Stat. 335, is a necessary concomitant of the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts." *Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 146, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988). By its own terms, the Act prohibits only the stay of judicial proceedings in a state court. *Entergy, Arkansas, Inc. v. Nebraska,* 210 F.3d 887 (8th Cir.2000). It does not apply to an injunction which prohibits the initiation of a state court proceeding. *Dombrowski v. Pfister,* 380 U.S. 479, 485, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)(Act does not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted). Where a state court proceeding has not yet been initiated but is threatened, a person can enjoin the state court only if he can show he will suffer irreparable injury by not doing so. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

■ Given the limitations of the Act to judicial proceedings, the Court finds that the Act would not preclude the issuance of a preliminary injunction against the Iberia Sheriff's department defendants. The Act does not apply to these defendants because they are not part of the judicial process. *See Louisiana Debating and Literary Ass'n v. City of New Orleans,* 42 F.3d 1483, 1490 (5th Cir.1995)(discussing *Younger* abstention which applies only to ongoing state proceedings that are "judicial in nature"). Similarly, the Act does not apply to plaintiffs' claim for prospective relief against any of the defendants since a proceeding must be "pending." *See Dombrowski,* 380 U.S. at 485, 85 S.Ct. 1116. Therefore the Act would only implicate plaintiffs' demand for injunctive relief as related to the District Attorney's conduct surrounding the February 5, 2000 incidents and prosecution thereof.

■ Pursuant to the express provisions of the Act, a federal court is permitted to enjoin a pending state court judicial proceeding when expressly authorized by statute, necessary in aid of the court's jurisdiction, or necessary to protect or effectuate the court's judgment. 28 U.S.C. § 2283. But as the Supreme Court has recognized, the exceptions to the Act are narrow and are "not [to] be enlarged by loose statutory construction." *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 287, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). The preliminary injunction in this case fits within one of the narrow exceptions to the act, namely, it is expressly authorized by an Act of Congress. Plaintiffs instituted this action pursuant to 42 U.S.C. § 1983. As an Act of Congress, § 1983 expressly authorizes the enjoining of state criminal proceedings. *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Fitzgerald v. Peek,* 636 F.2d 943 (5th Cir.1981).

■ Despite the inapplicability of the Act to plaintiffs' claims against the District Attorney, plaintiffs must still satisfy the traditional requirements for obtaining equitable relief, namely, plaintiffs must demonstrate that they will suffer irreparable harm if an injunction is not issued. *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). This recognition is referred to as *Younger* abstention and is a reflection of a national policy forbidding federal courts from staying or enjoining pending state court proceedings except under special circumstances. *Id.* at 41, 91 S.Ct. 746. The concept of *Younger* abstention has been described as "Our Federalism," "a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44, 91 S.Ct. 746. "Our Federalism" represents "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.*

■ The legal requirements to demonstrate irreparable injury under *Younger* abstention entails more than the cost, anxiety and inconvenience of having to defend against a single criminal prosecution. *Id.* at 46, 91 S.Ct. 746. Where a prosecution is brought in good faith, even if brought pursuant to an unconstitutional statute, the federal plaintiff's rights are adequately protected without the need of an injunction because he will have an opportunity to raise his constitutional claims in his defense of the state prosecution. *Id.*

at 49, 91 S.Ct. 746. In contrast, where a single prosecution will result in injury that is both great and immediate, *id.* at 46, 91 S.Ct. 746, where the state law is flagrantly and patently violative of express constitutional prohibition, *id.* at 53, 91 S.Ct. 746, or where there is a showing of bad faith, harassment, or other unusual circumstances such as a series of repeated prosecutions to which the plaintiff will be subjected to, *id.* at 54, 91 S.Ct. 746, the federal plaintiff has sustained his burden of proving irreparable injury.[9] In determining whether these exceptions to the general rule set forth in *Younger* apply, the Fifth Circuit has held that "the strength of the evidence and seriousness of the charges should be considered in determining if retaliation or bad faith exists." *Smith v. Hightower*, 693 F.2d 359, 369 (5th Cir.1982). "There are three factors that courts have considered in determining whether a prosecution is commenced in bad faith or to harass: (1) whether it was frivolous or undertaken with no reasonably objective hope of success; (2) whether it was motivated by the defendant's suspect class or in retaliation for the defendant's exercise of constitutional rights; and (3) whether it was conducted in such a way as to constitute harassment and an abuse of prosecutorial discretion, typically through the unjustified and oppressive use of multiple prosecutions." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir.1997). The bad faith exception to *Younger* has also been held to apply where there has been improper influence exerted on the prosecutor by certain public officials. *Fitzgerald*, 636 F.2d 943.

Also important to the *Younger* abstention analysis is the shifting burdens of proof applied to a preliminary injunction hearing:

The Court should consider whether the plaintiffs have shown, first, that the con-

---

**9.** "It is well established that a showing of bad faith prosecution presents a narrow exception to the doctrine of abstention which will justify

federal interference in a pending state court criminal proceeding." *Fitzgerald*, 636 F.2d at 944.

duct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.

*Wilson v. Thompson,* 593 F.2d 1375, 1387 (5th Cir.1979). Important to the application of this test enunciated by the Fifth Circuit is the recognition that it is not "necessary for plaintiff to prove that the prosecution could not possibly result in a valid conviction." *Fitzgerald,* 636 F.2d at 945.

■ Applying the above standards to the case at bar, the Court finds that plaintiffs have met their burden of proving irreparable injury while the District Attorney has failed to make even a minimal showing warranting abstention. As discussed *infra,* plaintiffs have demonstrated that the conduct sought to be deterred, namely the playing of "gangster rap," is constitutionally protected. Also discussed *infra* is the Court's conclusion that the District Attorney's bringing of the criminal prosecution was motivated at least in part by a purpose to deter the plaintiffs' playing of music the District Attorney found objectionable. Haney admitted that his office's decision to pursue criminal charges was based in part on the view that "gangster rap" contributed to the violence which criminally implicated Torries and Boudoin. *Official Transcript,* p. 37, lines 4–11; p. 173, lines 16–25. Plaintiffs having satisfied their burden of showing the inapplicability of *Younger* abstention, the District Attorney had an affirmative burden to show that it would have reached the same deci-

sion as to whether to prosecute even had the music played at the Skate Zone not been considered.

Throughout the hearing on plaintiffs' application for a preliminary injunction, the District Attorney, through his testimony and questioning of other witnesses and his attorneys' questioning of other witnesses, insisted that his office's actions in pursuing the prosecution of Torries and Boudoin was based primarily on the history of violence documented at the Skate Zone. Haney testified that in making the decision to prosecute, his office relied upon the Iberia Sheriff's department records which allegedly documented the history of violence. *Official Transcript,* p. 14, lines 13–18; p. 190, lines 5–9. With this professed justification, it was imperative that the District Attorney introduce into evidence the alleged complaints and other records related to violence at the Skate Zone which the Iberia Sheriff's department allegedly provided to the District Attorney. However, the only documents purportedly relied upon by the District Attorney's office which were introduced into evidence were the affidavits of arrest prepared by Sergeant Gerald Scott, submitted not by the District Attorney but by plaintiffs. *Plaintiffs' Exhibits 3 and 15.* These affidavits unequivocally state that the "type of music is the principal cause of the large gang fights." *Id.* With only this evidence before it, the Court cannot conclude that the District Attorney would have reached the same decision to prosecute plaintiffs even had the music played at the Skate Zone not been considered. Based on the affidavits, the only conclusion the Court can reach is that the music played was the only factor the District Attorney considered. The District Attorney could have offered the testimony of Wilfred Christian, the assistant district attorney who Haney admitted made the decision to prosecute Torries and Boudoin. *Official Transcript,* p. 12, lines 8–12. Despite Christian's presence throughout the entire proceeding and the stipulation by plaintiffs' counsel that he would have no cause to object to Christian

testifying because Christian had participated as an attorney in the proceeding for the District Attorney, the District Attorney never offered Christian's testimony in support of his office's decision to prosecute plaintiffs. Whether the District Attorney's decision not to present any evidence at the preliminary injunction hearing was strategic or otherwise, his decision not to present any evidence in support of *Younger* abstention is fatal.

### B. Preliminary Injunction

#### 1. Likelihood of Success on the Merits

Having concluded that plaintiffs' claims against the District Attorney are not barred by the *Younger* abstention doctrine, the Court must determine whether plaintiffs have satisfied the four requirements necessary for the issuance of a preliminary injunction against the defendants.

Before a preliminary injunction is issued, a plaintiff must demonstrate a substantial likelihood of success on the merits. The heart of plaintiffs' claims in the present action allege a violation of their First Amendment right to freedom of expression. "Although the text of the First Amendment states that 'Congress shall make no law...abridging the freedom of speech, or the press,' the Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment." *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 489, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). The redressability of First Amendment violations through the Fourteenth Amendment is made possible through the Supreme Court's adoption of the doctrine of "incorporation."

As originally drafted, the Bill of Rights, embodied in the first ten amendments to the Constitution, was intended to protect the citizens of the United States from infringement of their most fundamental rights by the federal government. *Barron v. The Mayor and City Council of Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). The Fourteenth Amendment, enacted in 1868 as one of the three Civil War Amendments, changed this rule. The Fourteenth Amendment provides in part that "[n]o state shall make or enforce any law which shall...deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. Referred to as the Due Process Clause of the Fourteenth Amendment, this clause prohibits state governments as opposed to the federal government from depriving persons of their fundamental right to liberty. Within this framework for protecting persons from state deprivations of their right to liberty, the Supreme Court has held that most, although not all, of the guarantees of the Bill of Rights are so important that if a state denies these rights, the state has taken away an aspect of liberty protected under the Due Process Clause. *Malloy v. Hogan,* 378 U.S. 1, 4, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Thus, where a fundamental right provided for under the Bill of Rights is implicated, the Supreme Court has held that the Fourteenth Amendment "incorporates" this right through the Due Process Clause. *Gideon v. Wainwright,* 372 U.S. 335, 341, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The First Amendment is one such fundamental right. *44 Liquormart, Inc.,* 517 U.S. at 489, 116 S.Ct. 1495.

Included in the passage of Congress' post-Civil War legislation was 42 U.S.C. § 1983, a codification of § 1 of the Civil Rights Act of 1871. "The text of the statute purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher,* 522 U.S. 118, 123, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). In order to recover under § 1983, plaintiffs must prove two elements: defendants conduct occurred under "color of state law" and deprived plaintiffs of a right secured by the Constitution of the United States. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). That the defendants in this case acted under color of state law is unquestioned. The right the plaintiffs contend

they were deprived of is their First Amendment right to freedom of expression.

"Music is one of the oldest forms of human expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). As a form of expression, music is protected by the First Amendment. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).[10] "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Because the First Amendment generally prevents government from proscribing speech or even expressive conduct because of disapproval of the ideas expressed, *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), content-based regulations are presumptively invalid. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (citations omitted). Only where a content-based regulation survives strict scrutiny review will it be upheld. *Id.*

▪ Under strict scrutiny, the government must show that its regulation is necessary to achieve a compelling interest. *R.A.V.*, 505 U.S. at 395, 112 S.Ct. 2538. As pointed out by the Supreme Court in *Wooley v. Maynard*, 430 U.S. 705, 716, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), even though the government's purpose may be substantial, "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." The Supreme Court reaffirmed this principle only recently in *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000),

wherein the Court held that, "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes."

▪ There is no question that the defendants' actions in this case were meant to not only regulate, but to prohibit speech based on its content. The affidavits of probable cause in support of the arrests of Torries and Boudoin state that the "gangster rap" music which contained vile, obscene, and indecent language was the principal cause of the fight that erupted at the Skate Zone on the night of February 5, 2000 and that Torries and Boudoin had knowledge of the music being played. *Plaintiffs' Exhibits 3 and 15*. Defendants' own assertions demonstrate that they were of the opinion that the "gangster rap" music caused fights, a position clearly implicating the content of the speech communicated by plaintiffs. Corporal Hebert testified that Davis ordered him to question the Hub City Security personnel to determine what "type" of music had been played on February 5, 2000. *Unedited Transcript*. He also stated that he would not have seized the compact discs from the Skate Zone if "Frosty the Snowman" was the only selection played on the night of February 5, 2000. *Id.* Davis admitted that he wanted to know if "gangster rap" had been played because he was of the opinion that the music caused or contributed to violence in youth. *Id.* Haney conceded that the content of the music precipitated the violence at the Skate Zone. *Official Transcript*, p. 37, lines 4–11; p. 173, lines 16–25. Sheriff Hebert supported his officers' actions on the belief that rap music was a contributing factor to the history of violence at the Skate Zone. *Unedited Transcript*. Moreover, Sheriff Hebert's

---

**10.** "First Amendment protection extends to rap music." *Davidson v. Time Warner, Inc.*, 1997 WL 405907 (S.D.Tex. 1997).

letter to the local clergy regarding the plaintiffs' arrest leaves no doubt that the defendants sought to restrict the content of the plaintiffs' communications. As Sheriff Hebert stated in his letter, "this music is demeaning to women, includes [sic] radical slurs, strong vulgar language and lyrics with anti-law messages...." *Plaintiffs' Exhibit 4.*

Additionally, there is no question that the defendants' actions are a prior restraint on the exercise of free speech. Sheriff Hebert testified that in a meeting with Torries in November of 1998, Hebert conveyed to Torries that if Torries continued to play violent, graphic and offense music, Torries could face criminal prosecution for his actions. *Unedited Transcript.*

The Court is unpersuaded by the defendants' post-suit professed explanations for arresting plaintiffs. While the Court from the record before it generally agrees that some history of violence at the Skate Zone has been established, that a lesser number of patrons and a greater number of or more professional security personnel may have been in order, that curfew violations may have occurred at the Skate Zone, that the Skate Zone may have violated state fire code regulations, and that based on these factors defendants *may* have had adequate grounds to charge plaintiffs with violations of appropriate and applicable state law, the overwhelming weight of the proof submitted at the preliminary injunction hearing supports only one conclusion: the defendants' actions were motivated by

the content of the music being played at the Skate Zone.

Related to plaintiffs' burden of demonstrating a likelihood of success on the merits are the defendants' assertions that the "gangster rap" in this case falls outside of the boundaries of protected speech.[11] The guarantees of the First Amendment are not absolute as there are categories of speech that receive little or no constitutional protection. *See Roth v. United States,* 354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). These unprotected categories include, *inter alia,* speech which advocates illegal conduct,[12] obscene speech[13] and speech directed at minors.[14]

Under the "incitement" analysis of the First Amendment, the constitutional guarantees of free speech do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430. Pursuant to the dual prong test enunciated by the Supreme Court in *Brandenburg,* speech advocating the use of force or crime can only be proscribed where two conditions are satisfied: (1) the advocacy is directed to inciting or producing imminent lawless action; and (2) the advocacy is also likely to incite or produce such action. *See Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973). In *Brandenburg,* the Supreme Court specifically addressed

11. Although the Court refers to "gangster rap" in general throughout the opinion, the only music which is actually challenged and to which proof was offered as to its playing on the night of February 5, 2000 is the song, "Down 4 My N's" by Snoop Doggy Dog. *Defendants' Exhibit # 4, Tract # 9.*

12. *See Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Related to *Brandenburg's* "incitement" analysis is the "fighting words" doctrine which applies when an individual directly addresses another, causing the latter to retaliate against the speaker. *Chaplinsky v. New Hampshire,* 315

U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Since the facts of this case do not involve circumstances in which the person transmitting the alleged communication was retaliated against, the "fighting words" doctrine is inapplicable.

13. *See Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

14. *See Sable Communications of Cal. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).

the distinction between speech containing offensive messages—which is protected under the First Amendment—and speech directly inducing others to engage in violent action, which is not. *Id.* at 448, 89 S.Ct. 1827.

Although persons could differ as to whether the music at issue is offensive, it clearly is not directed at inciting and producing imminent lawless action. Other courts which have addressed the playing of musical recordings have refused to find the recordings incited disruptive conduct merely because certain acts occurred after the recordings were played. *Davidson,* 1997 WL 405907 at *20; *Waller v. Osbourne,* 763 F.Supp. 1144 (M.D.Ga.1991). Defendants have failed to indicate how the "gangster rap" allegedly played on February 5 was directed toward any particular person or group of persons at the Skate Zone. The testimony of Dr. Kenneth Bouillion regarding the effects of rap music on persons under eighteen years of age was speculative at best.[15] Although the Court has no reason to dispute Dr. Bouillion's opinion that there is some correlation between the exposure to media violence (television, video and musical compact discs) and aggressive behavior in children, the Court is not persuaded that any such assumed correlation is strong enough to overcome the protections of the First Amendment, certainly not on the record before this Court.

Defendants' correlation between the playing of "Down 4 My N's," *Defendants' Exhibit # 4, Tract # 9,* and the instantaneous violence that allegedly erupted is highly suspect given the other factors that existed at the Skate Zone on the evening of February 5, 2000. The testimony of Corporal Hebert and others affirmatively demonstrates that a geographic rivalry existed on the night of February 5 and continues to exist between Iberia and St.

Mary Parish youth. Added to this group rivalry was Sikes' untimely departure announcement which further provoked the situation. When the totality of these circumstances are evaluated, the only conclusion the Court can make with confidence is that the "gangster rap" music did not in and of itself incite imminent lawless action under *Brandenburg.*

■ Similarly, the Court finds the defendants have failed to prove that the music in question is obscene under the clearly enunciated standards set by the United States Supreme Court. "[W]here obscenity is not involved, [the Supreme Court has] consistently held that the fact that protected speech may be offensive to some does not justify its suppression." *Carey v. Population Services Int't,* 431 U.S. 678, 701, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). When an expressive action is challenged on the grounds that it is obscene, the communication is subjected to the three part test set forth by the Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973):(1) Whether the average person applying community standards would find the work, taken as a whole, appeals to the prurient interest; (2) Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; and (3) Whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. The Fifth Circuit has held that this test is conjunctive. *Penthouse International, Ltd. v. McAuliffe,* 610 F.2d 1353, 1363 (5th Cir.1980). Thus, a work cannot be held obscene unless each element of the test has been evaluated independently and all three have been satisfied.

Without having to decide whether "gangster rap" appeals to the community's

---

**15.** In a separate Memorandum Ruling and Order, the Court granted plaintiffs' motion *in limine* as to Dr. Bouillion's testimony in his capacity as an expert witness on the issue of music and its effects on violence in youth. The Court references Dr. Bouillion's testimony in the present ruling only to highlight the lack of authority supporting the defendants' positions.

prurient interest or whether it depicts patently offensive sexual conduct, the Court finds that defendants have not established the third element of the *Miller* test, that is, the work lacks serious artistic value. Although defendants challenge the lyrics of the songs at issue, the Court finds there is no evidence the music applied to the lyrics is a sham attempt to protect obscene recordings. *See Luke Records. Inc. v. Navarro,* 960 F.2d 134, 136 (11th Cir.1992). Based on this conclusion, the *Miller* test is applied to the lyrics and the music as a whole. *Id.*

In *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), the Supreme Court clarified the artistic value inquiry of the *Miller* test. The *Pope* Court held that whether a work possesses serious artistic value is not a question to be decided by contemporary standards. *Id.* at 501, 107 S.Ct. 1918. The Court reasoned that the fundamental principles of the First Amendment prevent the value of a work from being judged solely by the amount of acceptance or lack thereof it has received within a given community. *Id.* Instead, the proper inquiry is "whether a reasonable person would find such value in the material, taken as a whole." *Id.* Despite the defendants' ostensible attempts to pass judgment upon the artistic value of "gangster rap" music, they are not the arbiters of artistic value in our society. The Court agrees with the defendants that some of the disputed music is offensive, but the Court cannot conclude that a reasonable person would find the music lacking in artistic value.

The Court also rejects defendants' arguments that because the speech at issue was directed at minors, a different standard for judging obscenity applies. While the Court agrees with the general proposition that communications which are not obscene when directed at adults can be considered obscene when directed at minors, *see Sable Communications of Cal. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)("there is a compelling interest in protecting the physical and psychological well-being of minors" which extends to shielding minors from indecent messages that are not obscene by adult standards), "that interest does not justify an unnecessarily broad suppression of speech addressed to adults . . . . [T]he Government may not reduce the adult population to only what is fit for children." *Reno v. American Civil Liberties Union,* 521 U.S. 844, 875, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

To support their position that this is not a case of an unnecessarily broad suppression of speech directed to adults, defendants rely on *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). *See Defendants' Memorandum of Law In Opposition to Application for Preliminary Injunction.* However, these cases are inapposite to the facts presented in the case at hand. In *Ginsberg,* the Supreme Court upheld the constitutionality of a New York statute that prohibited selling to minors under 17 years of age material that was considered obscene as to them even if not obscene as to adults. One of the Supreme Court's principal reasons for upholding the constitutionality of the statute was because "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." *Id.* at 639, 88 S.Ct. 1274.

Here, the defendants' actions prohibit parents who desire for their children to listen to "gangster rap" music while using the Skate Zone facilities. Both Boudoin and Sikes testified that a portion of the Skate Zone clientele includes parents who are chaperoning their children. *Unedited Transcript.* The fact that these parents frequented the Skate Zone is evidence enough to indicate that at least some parents desire for their children to listen to the music defendants find offensive.

In *Pacifica,* the second case relied upon by defendants, the Supreme Court upheld

a declaratory order of the FCC, holding that the broadcast of a recording of a twelve minute monologue entitled "Filthy Words" that had previously been delivered to a live audience "could have been the subject of administrative sanctions." 438 U.S. at 730, 98 S.Ct. 3026. The Supreme Court reasoned that broadcasting, as a form of communication, required the most limited First Amendment protection. *Id.* at 748–749, 98 S.Ct. 3026. The Court concluded that the ease with which children may obtain access to broadcasts justified different treatment of indecent broadcasting. *Id.* at 749–750, 98 S.Ct. 3026.

Unlike the communications in *Pacifica,* the communications in this case were not media broadcasts. While parents may have little or no control over the broadcast communications their children are exposed to, parents have absolute control over whether or not to allow their children to attend the Skate Zone on Saturday nights. Parental control of their children's attendance at the Skate Zone is an adequate protection from unexpected program content, a level of control which is patently different compared to a broadcast communication. *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874. Voluntarily going to the Skate Zone "is not the same as turning on a radio and being taken by surprise by an indecent message." *Sable,* 492 U.S. at 128, 109 S.Ct. 2829.

More importantly, defendants have failed to demonstrate that only minors frequent the Skate Zone. Even if the Court found the music at issue to be obscene as to minors, the Court could not condone the defendants' continued censorship of the Skate Zone at the expense of an adult audience who wishes to listen to the contested music. *See Reno v. American Civil Liberties Union,* 521 U.S. at 874, 117 S.Ct. 2329. Boudoin and Sikes testified that although the exact numbers were uncertain, some persons over eighteen years of age frequented the Skate Zone as patrons and were not present as a result of a custodial or supervisory obligation. *Unedited Transcript.* By denying minors access to potentially harmful speech, the defendants have suppressed a segment of speech that adults have a constitutional right to receive. *Id.* "That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose" the defendants attempt to achieve. *Id.*

"Regulations which permit the Government to discriminate on the basis of content of the message cannot be tolerated under the First Amendment." *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board,* 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). The defendants' stifling of plaintiffs' First Amendment freedoms in this case cannot be permitted. Rather than choosing the least restrictive means to control the alleged violence at the Skate Zone, defendants have thrown the broadest net possible. Accordingly, plaintiffs have sustained their burden of showing a substantial likelihood of success on the merits.

### 2. Irreparable Injury

In the discussion of *Younger* abstention *supra,* the Court has already determined that plaintiffs satisfied the irreparable injury requirement as to the District Attorney. "Where the allegation is that the state proceedings, though brought under a valid statute, were instituted in retaliation for or to deter the exercise · of constitutionally protected rights, the question of the applicability of the *Younger* exception and that of the existence of a constitutional violation merge: to prove one is to prove the other." *Wilson,* 593 F.2d at 1385, n. 17.[16] "A showing of bad faith or harassment is

---

**16.** *Wilson,* 593 F.2d at 1383 ("[I]rreparable injury is sufficiently established if the federal plaintiff demonstrates that the state prosecution against him was brought in bad faith for the purpose of retaliating for or deterring the exercise of constitutionally protected rights.").

equivalent to a showing of irreparable injury under *Younger*, and irreparable injury independent of the bad faith prosecution need not be established." *Fitzgerald*, 636 F.2d at 944. Because the Iberia Sheriff's department defendants were not included in that discussion, the Court must determine whether plaintiffs have also satisfied the irreparable injury requirement as to them.

■ Relevant to plaintiffs' claims against the Iberia Sheriff's department defendants, the Supreme Court has held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Ingebretsen on Behalf of Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Even if this case did not implicate First Amendment freedoms, plaintiffs have nevertheless demonstrated irreparable injury due to the fear of facing future arrests. Despite Davis and Sheriff Hebert's denials that they ever threatened plaintiffs with future arrests, plaintiffs' fears were validated by Corporal Hebert's testimony at the preliminary injunction hearing. After explaining to the Court why he believed "gangster rap" contributed to violence at the Skate Zone, Corporal Hebert stated with assurance that he would seize the compact discs again if he were faced with the same situation as that on the night of February 5. *Unedited Transcript.* Corporal Hebert also prepared an incident report dated April 4, 2000 which contained the following statement: "Skate Zone to remain closed until further notice." *Plaintiffs' Exhibit 5.* The only rational explanation for this statement is that the Skate Zone was to remain closed until the defendants gave further notice. In light of Corporal Hebert's statement and his incident report, the Court finds that plaintiffs have and are faced with a realistic possibility of being rearrested on account of the music being played at the Skate Zone. Accordingly, plaintiffs have satisfied the irreparable injury requirement for injunctive relief.

### 3. Irreparable Injury Outweighs Harm to Defendant

■ There does not appear to be any harm to the defendants if the Court were to enjoin them from continuing to threaten to arrest plaintiffs for the playing of music that is constitutionally protected, to require defendants to return the seized compact discs to plaintiffs, to require defendants to obtain a court ordered warrant for subsequent searches of the Skate Zone premises by representatives of the defendants, and to bar the prosecution of plaintiffs for the crimes which are alleged to have arisen out of the February 5, 2000 incidents. Such a prohibition would not preclude the defendants from fulfilling their law enforcement obligations to maintain the peace in Iberia Parish and to ensure the safety of its citizens, including those who may choose to frequent the Skate Zone. The defendants would only be prohibited from undertaking actions for which they have no lawful authority, namely, arresting and prosecuting plaintiffs because of the constitutionally protected music played at the Skate Zone.

### 4. Injunction's Effect on Public Interest

■ The defendants' actions in depriving plaintiffs of their First Amendment rights are unconstitutional so the public interest is not disserved by an injunction preventing future deprivations. *See Ingebretsen on Behalf of Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir.1996). With respect to the interests of the District Attorney's office, it by definition does not have any legitimate interest in pursing a prosecution brought to deter the plaintiffs' exercise of constitutionally protected rights. *Wilson*, 593 F.2d at 1383. Although there may be public interest in not exposing our young people to the types of music which some, if not many, people find offensive, there is an even stronger public interest in protecting

one of our most fundamental freedoms, the freedom of expression. If parents in New Iberia and surrounding communities feel strongly enough about exposing their children to the type of music played at the Skate Zone, they can simply exert their parental prerogatives and discontinue future patronage of the business by their children.

### 5. Propriety of Injunctive Relief

Although "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), to justify the issuance of injunctive relief, "a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." *Doran v. Salem Inn*, 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). "To justify...interference [with state law enforcement efforts,] there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." *Spielman Motor Sales Co. v. Dodge*, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322 (1935).

As to the propriety of injunctive relief against the District Attorney, the Court is guided by the teachings of the Supreme Court in *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). In *Wooley*, the Supreme Court found an exceptional situation where the plaintiff had been subjected to three prior prosecutions under the challenged statute. The Court noted, however, that the plaintiff's situation was "quite different from a claim for federal equitable relief when a prosecution is threatened for the first time." *Id.* at 713, 97 S.Ct. 1428. The Court reasoned that the threat of repeated prosecutions in the future against the plaintiff and his wife, "and the effect of such a continuing threat on their ability to

perform the ordinary tasks of daily life which require an automobile, are sufficient to justify injunctive relief." *Id.*

The plaintiffs' situation in this case is substantially different from that of the plaintiff in *Wooley* in that they have not been repeatedly prosecuted by the District Attorney. The circumstances as they now stand are not exceptional enough to necessitate injunctive relief. The Court will therefore limit plaintiffs' relief as to the District Attorney to the award of declaratory relief and deny their request for injunctive relief.

However, as to plaintiffs' request for injunctive relief against Sheriff Hebert and Commander Davis, the Court finds that the circumstances of this case are indeed exceptional. Plaintiffs have and continue to face a realistic possibility of being subjected to rearrest on account of the music played at the Skate Zone. No award of monetary relief could adequately compensate plaintiffs if they were subjected in the future to the same type of actions by Sheriff Hebert or his deputies.

### IV. Conclusion

For the foregoing reasons, the Court finds that the actions of defendants Sheriff Sid Hebert and Commander Kerry Davis in arresting plaintiffs and of the defendant District Attorney in prosecuting plaintiffs were premised on the content of the music played at the Skate Zone and as such, resulted in an impermissible deprivation of plaintiffs' rights to freedom of expression as guaranteed by the First Amendment. Plaintiffs have demonstrated a likelihood of success on the merits, irreparable injury, that the threatened injury outweighs any harm the injunction might cause the defendants, and that the injunction will not impair the public interest. Accordingly, the Court holds that plaintiffs are entitled to the requested injunctive relief against Sheriff Hebert and Commander Davis but because of the circumstances of this case,

plaintiffs' relief against the District Attorney is limited to a declaratory judgment.